Good morning, Judge Wallace, Judge Noonan, and Judge Roberts. Thank you, Judge McKeon. I'm Kim Pedersen, representing Petitioner Asanoor this morning. And I'd like to say Asanoor entered the United States lawfully in 1991. She applied for asylum. She's a registered nurse assistant and emergency hospital technician today. She has an 8-year-old United States citizen daughter following a rape. She's since married a United States citizen with whom she has a 4-year-old son. The visa petition filed by her husband has been approved, December 2001, following the board's decision. She is a 42-year-old Nigerian woman of the Ropo tribe. She was forced to undergo female genital mutilation while she was halfway pregnant at approximately 4 to 5 months. Let me ask you on your statement about the visa petition by the husband having been approved. Yes. How does that figure in, if at all, to the appeal here? It was approved more than 90 days after the board's decision, so it can't go in directly on a motion to reopen. If this were to be reopened, however, it would become an additional application. Would you mind speaking just a little bit more loudly? I'm not quite getting it. I'm sorry. Yes, Your Honor. Can you hear me now? She suffered psychological trauma, extensive bleeding and consciousness, premature childbirth. She was subject to a type 2 female genital mutilation, known as FGM. This includes removal of the clitoris and the labia minora. She continues to suffer recurrent infections. She has required cesarean sections for subsequent childbirth, and she is unable to experience sexual feeling, has nightmares, and has been diagnosed with post-traumatic stress disorder. That is contained in the administrative record at AR 5 and 9. Her 8-year-old United States citizen daughter faces probable forced female genital mutilation upon her return. Let me see if I understand correctly. Her daughter is a U.S. citizen. That's correct. She does not have to go back to Nigeria. She's 8 years old. She would remain with her mother as a minor child. Now, if the mother goes back to Nigeria, what evidence is there that the same episode would occur again? Isn't this a one-time episode? This is a one-time episode to the mother. However, as I'm trying to point out, this has recurring, continuing, and permanent consequences. This is not a one-time discrete act, and there has been language substantiating that from health organizations, from UNHCR, and from cases, which I'd like to cite. I understand, but isn't the evidence clear that if she goes back, she will not undergo this particular procedure again? Not this particular procedure. If she were to object to her daughter being forcibly subjected, she would suffer the torture of witnessing her daughter having to go through this. That's your daughter. Just focus, if you would, please, on the mother. Yes, Your Honor. If the mother goes back, there's no evidence in the record that she would undergo this same procedure again. Apparently, that would be correct unless something more were to occur. If she were to oppose her daughter as being subjected to it. Well, stay away from the daughter for just a moment. Just bear with me, please. Okay. And it's her burden to demonstrate that she would be tortured. If she would not have this particular procedure again, what evidence is in the record that she would be tortured if she returned to Nigeria? Well, there is. If she were to try to prevent her daughter from being subjected to it, she herself would be subjected to the harm. Just stay with me for just a second. You're moving off to another issue. Just restrict yourself to this issue. You would help me a lot. I have to make this decision. I need some help from you. That's what I'm here for. What evidence is there that the mother herself would be tortured again if she returned to Nigeria? She may not be subjected to the same procedure of FGM. She would, however, possibly have to witness her daughter being subjected to a forcible surgery against her will that will be imposed on her as a permanent amputation of part of her body. I take it from your answer there is no evidence that she herself would be tortured if she returned to Nigeria. Your argument is that the only torture she would suffer would be the torture that might be inflicted upon her daughter. That would be additional torture. In addition to psychological trauma. Let's go back. In addition to what? What torture would the mother have if she returned to Nigeria? Well, it depends how restricted you define torture. She's been diagnosed with post-traumatic stress disorder. To send a person back to the place in which they have already suffered torture could be defined as continuing torture. Do you have a case that supports that proposition? Well, I do. The cases so far indicate that she has to demonstrate torture to herself. I do. I do have a couple of cases which I'd very much like to cite. I have a recent case from the Board of Immigration Appeals. In fact, I'd like to introduce these. There's two cases from the board. The first one is Inri YTL. This was regarding forced sterilization for a Chinese man whose wife was subjected to forced sterilization. He was found that that was a continuing harm to him that his wife had been forced to sterilization. And the Board of Immigration found that a continuing harm. This is under a separate statute, though not the statute to which you're referring. It's for persecution and continuing harm. The board did say in that decision that they would not go ahead and reach the issue of relief under the torture convention because they found it was continuing harm sufficient for persecution. However, following that, the next day, the very next day, they used the same language, finding FGM to be a permanent and continuing harm. And there can be no, if I may, should not be viewed as a discreet one-time act. Coerced female genital mutilation is better viewed as a permanent and continuing act of persecution. The permanent nature of such harm has rarely if ever been called into question. The Board of Immigration itself has accepted that that is a continuing harm on May 23rd, 2003. Which case was this? What I'd like, Your Honor, there's a matter of YTL on May 22nd by a full panel of the board. The following day, a three-panel board of immigration appeals. The following day, a three-panel board made a decision specifically for a Nigerian case involving a woman who had already suffered FGM. They used the same language as they used in YTL regarding permanent ongoing harm and did not publish the FGM decision but published the forced sterilization decision. The language is exactly the same. And three of the panel members on that second case were part of the full panel the day before. If we accept your premise, which I think is understandable, that the fact that she suffered this mutilation earlier could have ongoing and continuing consequences were she to be returned to that same country, we have a procedural issue that we need to get over, several procedural issues, but this 90-day deadline issue, would you respond to that? Yes. For the relief under the torture convention, there is not the 90-day deadline. No, I understand that. And I understand there's a separate argument on the CAT standard, which we'll ask the government about. But stick now, again, with the issue because we've got several issues on the case that we'll need to answer. The first of these is the reopening under the 90-day deadline. Do you have a case or a regulation that supports your position that there was an abuse of discretion on that decision? Yes. I would cite first we have a claim of ineffective assistance of counsel. And if I may point out, in fact, former counsel was suspended and he was suspended on August of 2003, and he's been disbarred and subjected to unentitled status. Our position is that in matter of Casinga decided in 1996, the board very clearly found FGM to be a persecution so much that they cited it as a per- My understanding is that she didn't discuss this with her counsel. Is that correct? That's correct. But what we're putting forth is that given Casinga in 1996, given Amnesty International's very strong statement starting in 1995, given our own State Department reports that did say Nigeria, as one of the West African countries, had at least a 50 percent of FGM being practiced, actually 60 percent if they looked at another figure and up to 90 percent, and that was all published in the State Department report in 1997 prior to the decision on the appeal. And counsel should have queried, if representing a political asylum claim from a woman from West Africa, given those statistics, given the board's finding that this would be a possible basis for persecution, had a duty to pursue that with her. She was a woman who obviously does not feel comfortable talking about this probably with a male attorney, but nonetheless should have asked some questions. When she went to new counsel in 1996, a female counsel, she was immediately asked questions regarding what, if anything, had happened to her in Nigeria given the ongoing publicity and condemnation. I think we have your point on that. You probably want to save two seconds. I'll give you a little extra, but we'll also give that to the government. We'll hear now from the government. There is additional ground. We'll hear from the government now, and then you'll have a little time on rebuttal because you have used all of your primary time. Good morning. May it please the Court. Russell Verby on behalf of Attorney General John Ashcroft. Ms. Asner's motion to reopen is twofold. It seeks protection under the Torture Convention, and second, she wanted to present additional information in support of the asylum claim that had already been heard by the immigration judge and the board. The first question in this case is whether Ms. Asner established that she is prima facie eligible for protection under the Torture Convention. In essence, she had to show that it's more likely not that she will be tortured upon her repatriation and that that torture will be either by the government, with the government's instigation, or at least with acquiescence. Ms. Asner does not fear that she will be forced to submit to general mutilation. That, unfortunately, has already occurred. Instead, she fears that her U.S. citizen child will have to submit to the procedure and that she will suffer mental distress. But absent from Ms. Asner's argument is any claim that she herself will be physically tortured again, much less an explanation of how the government, either in its own name or through acquiescence to the conduct of others, is going to inflict further mental distress on her. The question I have there is it seemed to me that the BIA used the wrong standard. They were really focusing on the government taking action as opposed to and being in the custody and control of the government, which isn't the standard under the Convention Against Torture. So I'm wondering, from this court's level, why we wouldn't simply remand on that point because we have the wrong standard and then let the BIA sort it out under the right standard with respect to that aspect of the case. The case law has obviously developed a bit in that the standard, as you say now, is just awareness. Right. As opposed to actual concrete evidence that something is about to happen to a particular person. On the other hand, Your Honor. There's more to it than that, and that's that the BIA followed its own case, Vin Ray J. E., and there's certainly a question of whether or not a person has to be under the physical control of the victim. Do you still stand by Vin Ray J. E.? Until the board overturns Vin Ray J. E., we stand by it at this point, Your Honor, but I think there are some decisions working their way through right now. But in this case, the problem is regardless of whether it's the government actually doing the government's control, the just awareness, nothing can happen to this particular petitioner. So to send it back for that particular basis that the wrong standard was applied would really be a futile act, and the law doesn't require that. Well, how are we going to do that? How do we know on what basis the board made the decision? I mean, if it was a district court case, we have different rules for that. But on the board, the Supreme Court spanked us pretty good on making a determination of what the board would do when the board is the person who has to interpret statutes, and that we should send it back to the board for a determination. An opinion, I suppose, the board was very happy with because of the decision of the Ninth Circuit in that case. But still in all that cases here, how can we make that decision now and distinguish the Supreme Court case? Well, I think, Your Honor, obviously you're talking about Ventura. The difference in this case lies in that it's not necessarily applying the proper standard. And regardless of which standard you apply, the fact remains, both the board and the I.J. found, that this particular alien has already undergone the procedure. So whether the standard applied is different, the torture claimed is not going to happen again. It can't happen again. It's impossible for it to happen again. The only person it may happen to is the daughter. And as we all know, the daughter is a U.S. citizen. She doesn't have to leave this country. Well, what you say is true. And if we send it back, that's probably what the board is going to say. I agree with that. But still in all, how do we know that the board applied the right standard? It may have made its decision based totally on a wrong standard. We don't know that. Isn't Ventura almost command us to send this back for reconsideration by the board under the proper standard? A tough question to answer in the sense that if you know the wrong standard was applied, yes. In this case, we're not sure. But the right decision was reached, and I think for the right reasons. You see, the difficulty is that it's kind of what's sus for the goose is sus for the gander. In other words, there are cases where it's clear to us when we look at the facts and then we look at the correct standard of law that the petitioner would get relief. And the Supreme Court said, no, you can't make that decision, even though it will be the same decision after it goes back to the VIA. That's not yours to make on the Court of Appeals. So this is just the flip side, which is you have the standard, and we might be able to make a decision. In this case, it would be a decision favorable to the government instead of against the government. So I'm not sure that we can make a distinction is the difficulty. In other words, we've got to take the Supreme Court at its word on these kind of things, don't we? I certainly agree with you, Your Honor. This is a more difficult situation, but I think it comes in the old expression, what did the board hang its hat on? Did the board hang its hat on the standard, or did the board hang its hat on the facts? In this case, it's the facts that are absolutely going to control. But what we don't know is whether those facts benchmarked against a different standard, the board could make a different decision. Suppose you're writing the decision, and you have distinguished Ventura. How would you write it? Your Honor, I'm not on the bench, but I think I would write it along the lines of looking at the facts of this case, looking at the legal standards that should have been applied, that the law would not require the futile act of sending this back to the board when the facts would never reach the standard. And I think that would pass the Supreme Court's scrutiny. I'd like to engage you on another aspect of the case. Yes, Your Honor. You were kind enough to give us the Seventh Circuit decision in a very similar case, and I was struck by Judge Posner's concurrence where he said this is a terrible situation and Congress should correct the statute. And that is certainly my impression. You'd have to agree, I think, but I'm not criticizing you. I'm just criticizing the law. The law is an anti-family statute. It's going to break up the relation between the mother and the daughter. Now, an administration committed to family values doesn't want to do that. So why should the Attorney General and the representatives of the Attorney General not be asking, pleading with Congress, change the statute? Your Honor, the asylum statute in general is a family-friendly family code. But this isn't. When looking at this, this breaks up a mother and a daughter. Otherwise, the daughter was exposed to a serious risk of harm. That's right. Isn't that correct? This is one of the very rare cases where asylum breaks up a daughter. All right, but why shouldn't Congress change it? Why shouldn't you or the Attorney General, you go back to the Attorney General, be asking Congress to change it? And why shouldn't we be asking, like Judge Posa, writing Congress, this ought to be changed? Your Honor, a change in the law does not come certainly from you. It doesn't come from you. No, I'm not criticizing you, but I'm just asking you as an American citizen. Asylum law, Your Honor, is intended to protect aliens. A United States citizen is protected by their birthright or by naturalization. The alien or the person that is in most fear of being tortured is protected by the law that keeps her here in the United States. Well, she won't be left an orphan, as the case would be in Judge Posa's case, but she'll be left a mother. That's the great family protection. She's separated from her mother. Isn't that true? Yes, Your Honor. All right. But if she's not separated, then she's subject to the same thing her mother was. In other words, Perhaps. Well, but you think there's a high likelihood and probability given the evidence in the record, correct? The evidence in the record is 50 percent prevalence. Yes, Your Honor. Well, now, against that background, it seems to me the status of a visa application is quite relevant. Do you know what it is? From the evidence presented in the record, it has been approved. Well, why shouldn't we hold this case up until it's approved? It's been approved, Your Honor. But the problem is the relief that was sought, in essence, a visa petition was secured longer when the person's outside proceedings and beyond the 90 days permitted for the person to come back. If we held proceedings open forever, waiting for marriages and opportunities, we'd never get anybody deported. You could open them up now. Is that correct? We could only by sui spani authority, which the board probably will not grant, or if the Department of Homeland Security agreed to it. This unjust anti-family result comes aboard when the board wouldn't open its proceedings? I dispute that it's unjust, Your Honor. This is the law. It's not family friendly. Isn't it unjust if you break up a mother and daughter or otherwise expose the daughter to serious harm? Isn't that injustice? It is regrettable, Your Honor, but the law is written. Why not injustice? She is being protected here in the United States. Let me ask you a different question, and that is I appreciate the Department's position because you have a lot of statutes to enforce, and each one has various variations that apply sometimes harshly, but you're enforcing them for literally millions of people. We do have an unusual situation here. Would the Department be amenable in this case, because unlike most cases you have a visa approval, and there is some discretion, of course, with General Ashcroft, to consider mediation in this case to see if there are some other avenues for resolution before the court issues its opinion? Your Honor, if the court issues a temporary order directing us to consider it, we certainly would, but the problem is if we agree to mediation in one case, with the millions of aliens we have to deal with, we might be going to mediation in every case. We go down a slippery slope. We will have very big difficulties effectively administering the laws that you described that I'm charged to administer. Right, although mediation, court-ordered or suggested mediation, in one case that has reached this level, wouldn't have any precedential value, would it, or effect? No, Your Honor, but word does get out, and we may wind up having that in almost every case. I understand. I appreciate your concern. It would encourage aliens to take steps, and I'm sorry my time has expired, but doing that would also encourage aliens to take steps that might prod the court into it, such as at the last minute filing a petition based on a marriage. Those things do happen. It's unfortunate I'm not saying it's happening in this case. I have every reason to believe this is a bona fide, wonderful marriage, but personal experience of the judges sitting on this court and anybody who's touched the immigration arena knows that marriage is sometimes abused. And courts are available to take action when it is abused as well. Thank you. We'll give you a minute for rebuttal since we've kind of gone over on both sides here. Thank you. On the motion to reopen exceptions, there is an additional ground under the regulations for a change in U.S. law, which has not been cited previously. And we would cite that as a second exception possibility for a motion to reopen after 90 days. There's also a change of circumstances in Nigeria. In this case, it would only be that the daughter was four years old at the time she filed a motion to reopen. The health organizations have found FGM occurs between the ages of four and ten. That would be a third possible exception under the 90-day rule. Do we take our obligations under the Torture Commission seriously or not? That, I think, is at issue here in the way that the board handled this case. It was a single board member decision made in September 2002. We have a full panel making an absolutely opposite decision in May of 2003 by a full panel finding FGM to be a continuing harm for persecution to a woman who's already suffered FGM. This is a clear contradiction between a full board panel and a single member. This needs to be remanded for a finding that goes beyond a single sentence saying there's no prospective harm, there's no acquiescence. We don't know what term acquiescence this board member relied upon. In fact, after that, this court determined that acquiescence means awareness only and that the board had been misinterpreting that definition. At a minimum, it should be remanded to find out what definition was being applied on this case. There's no discussion of the medical doctor or the psychological findings. There's no discussion of prospective harm to the daughter or the continuing torts the mother would face in watching that or dealing with that. There's no discussion of the State Department report saying there's continuing FGM for 60 to 90 percent of the women. None of that's been discussed by this board decision. In matter of Casinga, 1996, the board said it remains practically true that African women have little recourse and may face threats to their freedom, acts of physical violence, social ostracization for refusing to undergo or attempting to protect their female children. The board said that in 1996. We've been waiting until May of 2003 for some further guidance on this very important issue if we're going to take our obligation under the Torch Convention seriously. We finally have gotten it. It's a contradiction to the decision in the incident case. I think we need clarification on what definitions were applied in Petitioner's case, at least. Thank you. Thank you very much. The case of Azenor v. Ashcroft is submitted. And the next case for argument today, I guess you can just remain there, is Dunton v. Ashcroft. Am I able to get copies of the two board cases I've referenced? You may provide them to the clerk. Thank you. And counsel. And have they been provided to Mr. Venby as well? Thank you. In the case of Dunton v. Ashcroft, we also have, once again,
judges: Wallace, Noonan, McKeown